T.C. Memo. 2012-165

UNITED STATES TAX COURT

AMIR H. JAFARPOUR AND LECIA R. PRANG, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3717-10.                    Filed June 12, 2012.

Amir H. Jafarpour and Lecia R. Prang, pro se.

Nicholas D. Doukas, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: Respondent determined a deficiency of $92,280 in

petitioners' 2006 Federal income tax. The issues remaining[1] for decision are: (1)

---

[1]Respondent now concedes that petitioners are not liable for a penalty under
sec. 6662(a).

whether petitioners are entitled to a bonus depreciation deduction under section

1400N(d)[2] for real properties purchased during 2006; and (2) whether petitioners'

real estate losses are passive activity losses under section 469.  For the reasons

stated herein, we find that petitioners are not entitled to a bonus depreciation

deduction under section 1400N(d).[3]  Moreover, we find that petitioners' real estate

losses are passive activity losses and therefore are not deductible against their 2006

active income.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts and

the attached exhibits are incorporated herein by this reference.  Petitioners resided in

California at the time their petition was filed.

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]While we ultimately find that petitioners' real estate losses are not deductible for 2006, we still decide whether petitioners are entitled to a bonus depreciation deduction for 2006 under sec. 1400N(d) because disallowed passive activity losses may be carried forward and deducted in future taxable years.  See sec. 469(b) (disallowed passive activity losses are available as a deduction against income from that activity in the next year); see also sec. 469(i) (prohibition against deducting passive activity losses is not applicable to the portion of the passive activity loss, up to a maximum of $25,000, which is attributable to rental real estate activities in which the individual actively participates).

Mr. Jafarpour began working full time for AMD/Spansion LLC (AMD) in 1989 and continued to work there full time as a computer engineer in 2006. In January 2006 petitioners sold stock options in AMD, receiving $169,621 in taxable income. Mr. Jafarpour concedes he was not a real estate professional during 2006. Ms. Prang began working as a chiropractor in 1989 and started her own chiropractic business in 1993. In 2001 she suffered a work-related injury requiring surgery and causing ongoing neck and shoulder pain. Thereafter, Ms. Prang decided to sell her chiropractic business and pursue a new career. Ms. Prang found a buyer in 2005 and sold her chiropractic business on June 30, 2006.

Ms. Prang continued her chiropractic business until at least the June 30 sale closing. Petitioners submitted Ms. Prang's appointment book (appointment book) from her chiropractic business to show that she spent no more than 390 hours working as a chiropractor in 2006.[4] The appointment book is approximately 120 pages. Each page lists three days and each day has space designated for scheduling appointments in 15-minute intervals from 8 a.m. through 5 p.m. Names, phone numbers, and miscellaneous notes are handwritten in the spaces representing the 15-minute intervals. Moreover, at the bottom of each daily section a number is written

---

[4]The chiropractic business purchaser continued using Ms. Prang's appointment book during 2006.

(daily total) that appears to represent either the number of patients seen that day or the number of hours worked that day.[5]  Finally, the notes written in the 15-minute interval spaces and the numbers written for the daily total are frequently illegible.

I.  Ms. Prang's Real Estate Activities

Petitioners owned one rental property at the beginning of 2006--their prior residence in Milpitas, California (Milpitas property).  They rented the Milpitas property to four different tenants from 1996 until 2006.  The same tenant has rented the Milpitas property since 2002, paying $1,500 per month for rent during 2006.

Ms. Prang eventually decided to expand her involvement with real estate.  She began researching potential real estate investments in early January 2006 around the same time petitioners exercised their stock options in AMD.  Most of her research consisted of online browsing followed by email exchanges and phone conversations with various realtors.  Ms. Prang reports that she spent over 300 hours conducting online research for real estate in numerous areas, including

---

[5]We are unable to determine what the daily total represents, and petitioners have failed to explain the significance of the number.  The daily total frequently does not coincide with either the number of patients filled in for the day or the amount of time it appears Ms. Prang was working.

California, Arizona, South Carolina, Florida, Colorado, and Nevada. Ms. Prang made one trip to Las Vegas in July 2006, but she did not purchase real estate in any of these areas.

A. Classes and Seminars

In June 2006 Ms. Prang attended a Las Positas Community College course on investing in real estate. The community college instructor recommended that Ms. Prang invest in properties costing $200,000 or less that were in areas where growth and appreciation were expected. The instructor also recommended that she either rent or sell the properties, depending on the market. The instructor also informed Ms. Prang of the importance of keeping records of her time working in real estate and introduced her to the idea of investing in properties located in the Gulf Opportunity Zone (GO Zone).[6]

Ms. Prang also attended seminars on investing in real estate. On July 24, 2006, she attended a real estate seminar in Fremont, California (Fremont seminar). The Fremont seminar included presentations from a financial planner, a certified public accountant (C.P.A.), an attorney, loan agents, and network realtors. Dean

---

[6]The GO Zone covers the portion of the Hurricane Katrina disaster area determined by the Federal Emergency Management Agency (FEMA) to be eligible for assistance from the Federal Government. The GO Zone includes various counties or parishes in Alabama, Louisiana, and Mississippi.

Bagley, C.P.A., gave a presentation during the seminar entitled "GO Zone Tax Strategy". Thereafter, petitioners hired Mr. Bagley as their C.P.A. Mr. Bagley advised petitioners on investing in the GO Zone.

B. Petitioners Enter the GO Zone

After exchanging several emails with Louisiana realtors, Ms. Prang visited several real estate properties in Louisiana from October 22 through 28, 2006. Similarly, Ms. Prang visited real estate properties in Alabama from November 13 through 17, 2006. In December 2006 petitioners purchased new construction residential real estate on: (1) Lake Meadows Court, Gonzales, Louisiana (Lake Meadows property); (2) Deerwood Drive, Daphne, Alabama (Deerwood property); and (3) Keldon Court, Daphne, Alabama (Keldon property).[7] The Lake Meadows property, the Deerwood property, and the Keldon property (collectively, new properties) are all in the GO Zone. Shortly after purchasing the new properties, petitioners signed contracts with real estate rental management companies[8] which

_____

[7]Petitioners signed an agreement to purchase the Lake Meadows property on October 26, 2006, but did not complete the purchase until December 1, 2006. The Deerwood property was purchased December 3, 2006, and the Keldon property was purchased December 21, 2006.

[8]Petitioners signed contracts with rental real estate management companies for the Keldon property and the Lake Meadows property on December 21, 2006, and signed the contract for the Deerwood property on December 15, 2006.

listed all of the new properties for rent before the end of the 2006 calendar year. However, during 2006 petitioners did not: (1) rent or receive rental income from any of the new properties; (2) have a real estate license; (3) file any forms with a secretary of state regarding any real estate business; (4) open a separate bank account with respect to the new properties; or (5) maintain financial statements for the new properties. Moreover, petitioners have not bought or sold any real estate since 2006 and have continued to hire management companies to manage the new properties.[9] The new properties were eventually rented in March, April, and May 2007.

II. Petitioners' Real Estate Log

Petitioners' real estate log consists of numerous documents in a large ring binder. The log is divided into seven sections: (1) Alabama; (2) Louisiana; (3) Loan Info; (4) Milpitas; (5) Misc Property; (6) Sage Drive; and (7) Classes/Seminars. Each section (except the Classes/Seminars section) begins with several pages of handwritten notes describing petitioners' real estate activities on specific dates. The handwritten notes are written in pen, and the time associated

_____

[9]Petitioners continued to hire rental real estate management companies to manage the Lake Meadows property until 2009 and continued to hire rental real estate management companies to manage the Keldon and Deerwood properties as of the time of trial.

with each real estate activity is written in pencil. On several occasions, petitioners report real estate activities on the same date in multiple sections of the real estate log.[10] Following the handwritten notes are numerous pages of supporting documentation.[11]

III. The Notice of Deficiency

Petitioners reported $312,311 of taxable wages on their 2006 Form 1040, U.S. Individual Income Tax Return, including: (1) $142,690 of wages from AMD, and (2) $169,621 from selling stock options in AMD. Moreover, petitioners reported a net loss of $271,242 from their 2006 real estate activities on Schedule E, Supplemental Income and Loss.[12] Respondent issued petitioners a notice of deficiency determining that petitioners were not entitled to deduct their reported losses from real estate activities.

---

[10]For example, on November 14, 2006, petitioners reported 4 hours of activities in the Alabama section, 5 hours of activities in the Louisiana section, and 10 hours of activities in the Sage Drive section.

[11]The supporting documentation consists of petitioners' research of rental properties, receipts, business cards, emails, etc.

[12]Petitioners elected to treat all of their interests in real estate as one activity pursuant to sec. 469(c)(7)(A).

## OPINION

Respondent contends that the new properties do not qualify for a bonus depreciation deduction under the GO Zone Act because they were not used in the active conduct of a trade or business during 2006.  Furthermore, respondent argues that for 2006 petitioners are not entitled to offset their active income with any of their rental real estate losses because neither petitioner was a real estate professional.

## I.  Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer has the burden of proving it incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  However, under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue.  Credible evidence is "'the quality of evidence which, after critical analysis, the court would find sufficient * * * to base a decision on the issue if no contrary evidence were submitted.'"  Baker v. Commissioner, 122 T.C. 143, 168 (2004) (quoting Higbee v. Commissioner, 116 T.C. 438, 442 (2001)).  Section 7491(a)(1) applies only if the taxpayer complies with substantiation requirements, maintains all

required records, and cooperates with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews.  Sec. 7491(a)(2).

Because we decide on the preponderance of the evidence whether petitioners were engaged in the active conduct of a trade or business during 2006, we need not decide whether section 7491 applies to this issue.  With regard to whether they were real estate professionals during 2006, because they have not produced credible evidence that their real estate activities were not passive activities, as explained infra, we find the burden of proof remains on petitioners.

## II.  Qualified Gulf Opportunity Zone Property

Section 1400N(d)(1)(A) provides that in the case of any qualified Gulf Opportunity Zone property the depreciation deduction provided by section 167(a) for the taxable year in which such property is placed in service shall include an allowance equal to 50% of the adjusted basis of such property.  Under section 1400N(d)(2)(A), the term "qualified Gulf Opportunity Zone Property" means property--

> (i)(I) which is described in section 168(k)(2)(A)(i), or
>
> (II) which is nonresidential real property or residential rental property,

- 11 -

(ii) substantially all of the use of which is in the Gulf Opportunity Zone and is in the active conduct of a trade or business by the taxpayer in such Zone,

(iii) the original use of which in the Gulf Opportunity Zone commences with the taxpayer on or after August 28, 2005,

(iv) which is acquired by the taxpayer by purchase (as defined in section 179(d)) on or after August 28, 2005, * * * and

(v) which is placed in service by the taxpayer on or before December 31, 2007 (December 31, 2008, in the case of * * * residential rental property).

Respondent asserts that petitioners' new properties do not qualify for a bonus depreciation deduction under the GO Zone Act because the new properties were not used in the active conduct of a trade or business in the GO Zone as required by section 1400N(d)(2)(A)(ii).[13]  We have found no cases or regulations addressing section 1400N(d)(2)(A).

_____

[13]Respondent does not contest whether petitioners' new properties are "qualified GO Zone Properties" under any other provision of sec. 1400N(d)(2)(A). Accordingly, we find respondent has conceded that petitioners' new properties meet the remaining requirements of sec. 1400N(d)(2)(A).  See Muhich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (issues not addressed or developed are deemed waived--it is not the Court's obligation to research and construct the parties' arguments), aff'g T.C. Memo. 1999-192; 330 W. Hubbard Rest. Corp. v. United States, 203 F.3d 990, 997 (7th Cir. 2000) (same); Larson v. Northrop Corp., 21 F.3d 1164, 1168 n.7 (D.C. Cir. 1994) (declining to reach issues neither argued nor briefed).

A. Section 1400N(d)(2)(A)(ii)

It is well settled that in interpreting a statute, we start with the language of the statute itself. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). If the language of the statute is plain, clear, and unambiguous, we generally apply it according to its terms. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989). In Huntsberry v. Commissioner, 83 T.C. 742, 747–748, (1984), we stated that "where a statute is clear on its face, we would require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein." However, if a statute is ambiguous or silent, we may look to the statute's legislative history to determine congressional intent. Burlington N. R.R. v. Okla. Tax Comm'n, 481 U.S. 454, 461 (1987); see Wells Fargo & Co. v. Commissioner, 120 T.C. 69, 89 (2003); Allen v. Commissioner, 118 T.C. 1, 7 (2002).

Section 1400N(d)(2)(A)(ii) provides that "qualified Gulf Opportunity Zone Property means property * * * substantially all of the use of which is in the Gulf Opportunity Zone and is in the active conduct of a trade or business by the taxpayer in such Zone". While section 1400N(d)(2)(A)(ii) does not explicitly reference section 162, the legislative history indicates that whether a taxpayer is "in the conduct of a trade or business" should be determined under section 162.

See 151 Cong. Rec. 29112 (2005) (stating that the legislative intent is explained in the committee report for the Gulf Opportunity Act of 2005 prepared by the Staff of the Joint Committee on Taxation); see also Staff of J. Comm. on Taxation, Technical Explanation of the Revenue Provisions of the Gulf Opportunity Zone Act of 2005, at 14 (J. Comm. Print 2005) ("The additional first-year depreciation deduction is subject to the general rules regarding whether an item is deductible under section 162 or subject to capitalization under section 163 or section 263A."). Therefore, petitioners' new properties are "qualified Gulf Opportunity Zone properties" if petitioners were engaged in the active conduct of a trade or business during 2006 under section 162.

B. Section 162

Pursuant to section 162(a), a taxpayer is entitled to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Such expenses must be directly connected with or pertain to the taxpayer's trade or business. Sec. 1.162-1(a), Income Tax Regs. An expense is ordinary if it is normal, usual, or customary within a particular trade, business, or industry or arises from a transaction "of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful for the development of the business.

Commissioner v. Heininger, 320 U.S. 467, 471 (1943). In contrast, except where specifically enumerated in the Code, no deductions are allowed for personal, living, or family expenses. Sec. 262(a). The determination of whether an expenditure satisfies the requirements of section 162 is a question of fact. Commissioner v. Heininger, 320 U.S. at 475.

Whether a taxpayer is engaged in a trade or business is determined using a facts and circumstances test under which courts have focused on the following three preconditions for the existence of a trade or business: (1) whether the taxpayer undertook the activity intending to earn a profit; (2) whether the taxpayer is regularly and actively involved in the activity; and (3) whether the taxpayer's activity has actually commenced. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); McManus v. Commissioner, T.C. Memo. 1987-457, aff'd without published opinion, 865 F.2d 255 (4th Cir. 1988).

Respondent contends that petitioners were not engaged in the active conduct of a trade or business on the basis of the first two factors: (1) petitioners did not undertake their real estate activities with the intention of earning a profit, and (2)

petitioners were not regularly and actively involved with the new properties during 2006.[14]

### 1. Whether Petitioners Were Regularly and Actively Involved in the Activity

To prove regular and active involvement in a trade or business, the taxpayer must show extensive business activity over a substantial period as opposed to a one-time venture or investment. Stanton v. Commissioner, 399 F.2d 326, 329-330 (5th Cir. 1968), aff'g T.C. Memo. 1967-137; McManus v. Commissioner, T.C. Memo. 1987-457. A taxpayer may have more than one trade or business. Wright v. Commissioner, 31 T.C. 1264, 1267 (1959), aff'd, 274 F.2d 883 (6th Cir. 1960). To be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity. Commissioner v. Groetzinger, 480 U.S. at 35. A sporadic activity, a hobby, or an amusement diversion does not qualify. Id. "[T]he fact that * * * [the taxpayer] devoted time to another job must be considered." Hawkins v. Commissioner, T.C. Memo. 1979-101, aff'd without published opinion, 652

---

[14]The parties' arguments focus mainly on whether petitioners were regularly and actively involved with the new properties during 2006. Because we find that petitioners were not regularly and actively involved with the new properties during 2006, as discussed infra, we need not decide whether petitioners intended to earn a profit or whether petitioners' activity had actually commenced.

F.2d 62 (9th Cir. 1981); see also Trans v. Commissioner, T.C. Memo. 1999-233.

While petitioners produced no business plan, they assert in their brief that they were engaged in a "real property acquisition and rental business" during 2006. In Estate of Brawner v. Commissioner, 36 B.T.A. 884, 890-891 (1937), the taxpayer invested over $1 million in 174 pieces of real estate over the four-year period from 1928 until 1932. He sold one property and exchanged one property over the same period. We determined that the taxpayer was not in the business of buying and selling real estate but was engaged in the business of managing rental property he had purchased as an investment. Similarly, we believe petitioners' "business plan" was to manage rental properties purchased as investments.

In O'Donnell v. Commissioner, 62 T.C. 781, 785 (1974), aff'd without published opinion, 519 F.2d 1406 (7th Cir. 1975), we held that the taxpayer could not deduct expenses associated with a trip to Miami to investigate the possible acquisition of rental property. The taxpayer, a resident of Chicago, Illinois, owned multiple rental properties in Las Vegas, Nevada. While the taxpayer argued that he was in a trade or business of owning and operating rental property on a large scale, we rejected the taxpayer's umbrella concept of a rental property trade or business without limitation. Id.

Petitioners assert that they remain involved in the day-to-day management of all the rental properties and continue to make all decisions concerning new tenants, rental terms, and expenditures. First, as explained infra, petitioners' records are not credible and therefore are of limited significance in determining whether they were regularly and actively involved in the business of managing rental real estate purchased as an investment. Accordingly, petitioners' assertions concerning their involvement with the new properties is also afforded minimal probative value. Finally, similar to the taxpayer's activities in O'Donnell, we do not believe petitioners' activities associated with the Milpitas property and the new properties fit under the same trade or business umbrella--the two ventures are separated by 10 years, over 1,000 miles, and $169,621 in stock options.

In the light of our holdings in O'Donnell and Brawner, for purposes of determining whether petitioners were regularly and actively involved in a trade or business in the GO Zone: (1) we do not consider petitioners' real estate activities associated with the Milpitas property; (2) we consider only the time petitioners spent managing the new properties.

While the record of petitioners' ongoing involvement with the new properties is limited, what little evidence there is suggests that petitioners' role was minimal. Petitioners live in California, and the new properties are in Alabama and Louisiana.

Most of petitioners' real estate activities in 2006 consisted of researching potential investment properties throughout the United States. In December 2006 petitioners purchased three properties in the GO Zone and thereafter hired rental management companies to list the properties for sale. Petitioners reported only 1.5 hours of real estate activities after the third property was purchased--a brief email exchange with their rental management company on December 21 and 22, 2006, indicating that petitioners' ongoing involvement would consist mainly of approving rent prices and tenants. Furthermore, petitioners continued to use rental management companies for the new properties in the following years. Since purchasing the new properties, petitioners have not purchased or sold any properties. While the fact that Ms. Prang sold her chiropractic business indicates that she would oversee all of petitioners' rental properties, on the basis of the foregoing discussion, we hold that petitioners were not regularly and actively involved in managing the new properties during 2006.

### 2. Conclusion

We conclude that petitioners were not engaged in the active conduct of a trade or business during 2006 with respect to their new properties and therefore are not entitled to a bonus depreciation deduction under section 1400N(d)(1).

III. Passive Activity Losses

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to the deductions claimed. Sec. 6001; INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Taxpayers are allowed deductions for most business and investment expenses under sections 162 and 212; however, section 469 generally disallows any passive activity loss for the tax year. Goolsby v. Commissioner, T.C. Memo. 2010-64. A passive activity loss is defined as the excess of the aggregate losses from all passive activities for that year over the aggregate income from all passive activities for such year. Sec. 469(d)(1). A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). Rental activity generally is treated as per se passive regardless of whether the taxpayer materially participates. Sec. 469(c)(2). However, under section 469(c)(7)(B), the rental activities of a taxpayer in the real property business (a real estate professional) are not per se passive activities under section 469(c)(2), but rather are treated as trade or business activities and are subject to the material participation requirements of section 469(c)(1). See sec. 1.469-9(e)(1), Income Tax Regs.

Under section 469(c)(7)(B), a rental activity is not treated as per se passive under section 469(c)(2) if:

(i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

(ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

In the case of a joint return, the foregoing requirements for qualification as a real estate professional are satisfied if either spouse separately satisfies the requirements.  Sec. 469(c)(7)(B).  Thus, if either spouse qualifies as a real estate professional, the rental activities of the real estate professional are not per se passive under section 469(c)(2) but are subject to the material participation requirements of section 469(c)(1).

Furthermore, for purposes of determining whether a taxpayer is a real estate professional, a taxpayer's material participation is determined separately with respect to each rental property, unless the taxpayer makes an election to treat all interests in rental real estate as a single rental real estate activity.  Sec. 469(c)(7)(A); sec. 1.469-9(e)(1), Income Tax Regs.  Petitioners made an election in 2006 to treat their rental[15] properties as a single activity.  Accordingly, their compliance with the

_____

[15]We have stated that a taxpayer's activities do not rise to the level of a rental trade or business until the property is at least held out for rent.  See Charlton v. Commissioner, 114 T.C. 333, 338 (2000); see also Woody v. Commissioner, T.C.
(continued...)

requirements of section 469(c)(7) is measured by treating all of their interests in rental properties as one real estate trade or business.

Petitioners concede that Mr. Jafarpour was not a real estate professional during 2006. Therefore, we must only determine whether Ms. Prang was a real estate professional during 2006.

The types of evidence that may be used to establish hours of participation are described in section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988),[16] which provides:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

---

[15](...continued)
Memo. 2009-93, aff'd, 403 Fed. Appx. 519 (D.C. Cir. 2010). While the new properties were not rented until 2007, they were listed as available for rent in December 2006. However, we need not determine whether the new properties were rental properties during 2006 because even if they were considered rental properties for purposes of sec. 469(c)(7), we still find that petitioners do not meet the requirements of sec. 469(c)(7)(B), as discussed infra.

[16]Material participation pursuant to sec. 469(c)(7) has the same meaning as under sec. 1.469-5T, Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988). Sec. 1.469-9(b)(5), Income Tax Regs.

We have held that the regulations do not allow a postevent "ballpark guesstimate" of time committed to participation in a rental activity. Moss v. Commissioner, 135 T.C. 365, 369 (2010); Bailey v. Commissioner, T.C. Memo. 2001-296; Goshorn v. Commissioner, T.C. Memo. 1993-578. Furthermore, we have found the credibility of a taxpayer's records is diminished where the number of hours reported appears excessive in relation to the task described. See Hill v. Commissioner, T.C. Memo. 2010-200, aff'd, 436 Fed. Appx. 410 (5th Cir. 2011); Bailey v. Commissioner, T.C. Memo. 2001-296.

A. Whether Ms. Prang Performed More Than One-Half of Her Personal Services in a Real Property Trade or Business

Petitioners assert that Ms. Prang spent 390 hours working in her chiropractic business and 951 hours on real estate activities during 2006. In support of these assertions, petitioners produced an appointment book for the chiropractic business and a real estate log for the real estate activities. We are unable to determine the number of hours Ms. Prang spent in her chiropractic business because the appointment book is not credible. Many of the patient visits and notes are illegible. The daily total frequently does not reconcile with either the number of patients scheduled for the day or the amount of time it appears Ms. Prang was

working.[17] We would have to engage in complete guesswork to determine how much time Ms. Prang spent at her chiropractic business on a particular day during 2006, let alone the entire year. We decline to engage in such dubious speculation.

Furthermore, while petitioners assert that Ms. Prang ceased working at the chiropractic business after selling the business, the appointment book contains numerous entries referencing Ms. Prang after June 30, 2006: (1) July 25, 28, and 31, 2006--"Dr. Prang not here"; (2) August 3, 2006--"Prang here for questions 11-3"; (3) August 30, 2006--"adj [sic] for Lecia"; (4) September 11, 2006--"Dr. Prang is coming in"; and (5) October 20, 2006--"Go to seminar with Dr. Prang". These references indicate that, contrary to petitioners' assertions, Ms. Prang was at least somewhat involved in the chiropractic business throughout the year. Because Ms. Prang's appointment book is not credible, we are not persuaded that Ms. Prang spent more than one-half of her personal services in a real estate trade or business during 2006.

---

[17]While petitioners failed to sufficiently explain the appointment book at trial, their brief asserts that new patients listed in the appointment book represent 45 minutes of time and existing patients listed in the appointment book represent 15 minutes of time. Even if we could tell the difference between a new patient and an existing patient, we would still be unable to determine the number of hours Ms. Prang spent in her chiropractic business during 2006.

B.  Whether Ms. Prang Performed More Than 750 Hours of Services in a
    Real Property Trade or Business

While Ms. Prang may have spent a considerable amount of time researching

and investigating investments in real estate and managing the Milpitas property, we

are not persuaded that she performed over 750 hours of services in real estate

activities during 2006 because petitioners' real estate log is not credible.  First, the

manner in which the entries were made suggests that they were not recorded

contemporaneously.  The handwritten notes explaining Ms. Prang's activities were

written in pen while the associated hours were written in pencil on the side of the

page.[18]  Petitioners testified that this was done so Ms. Prang could cross-reference

her recorded times with her phone records and make adjustments.  While this may

be true, it does not explain why most of the hours are recorded as whole numbers

and occasionally multiple time entries are reported for the same activity.[19]

Secondly, in several circumstances the number of real estate hours reported

appears excessive in relation to the task described.  After renting the Milpitas

---

[18]Petitioners testified that the handwritten notes were provided to the Appeals
officer.  The Appeals officer testified that petitioners provided him with a typed
document, not handwritten notes, at the Appeals conference.

[19]For example, in the Louisiana section on October 21, 2006, petitioners
record an entry of "8" hours and of "9" hours for the same activity.  Ms. Prang
either spent 17 hours looking at properties online that day or mistakenly entered two
different time entries for the same activity.

property for approximately 10 years, Ms. Prang reports she spent two hours every month (three hours in April) throughout 2006 depositing the rent check, mailing the mortgage payment, and making the associated bookkeeping entries. The real estate log is also filled with unreasonable assertions of time spent exchanging emails. For example, the Loan Info section reports that on November 8, 2006, Ms. Prang spent one hour reading "Hi Lecia, I'm your loan processor and will be your main contact person from this point on. I received the FedEx package you sent back. I will review it and prepare the file for my underwriter to review. I will update you with the status within 3 business days." The Sage Drive section reports that on October 14, 2006, Ms. Prang spent two hours emailing "Hi Janet, We have met with our tax accountant and we are ready to proceeded [sic]. Please let me know what we need to do." Moreover, the Louisiana section reports that on November 2, 2006, Ms. Prang spent an hour reading a five-sentence email. The log contains several similar assertions.

Moreover, comparing petitioners' time entries from the various real estate log sections further illustrates that the time entries were excessive and not credible. On November 1, 2006, Ms. Prang reports working 17 hours, including: (1) Louisiana section--11 hours reviewing property listings in Louisiana; (2) Sage Drive section--4 hours reviewing and faxing a contract addendum; and (3) Milpitas section--2 hours

depositing rent check, mailing the mortgage payment, and making the corresponding bookkeeping entries.

Perhaps the most suspect entries relate to Ms. Prang's trip to Alabama. In the Sage Drive section Ms. Prang reports 12.5 hours of travel time to Mobile, Alabama, on November 13, 2006. The following day, Ms. Prang reports that she left her hotel at 8 a.m. to meet with "Keith from T&K Construction" and visit some properties. She reports she spent eight hours visiting properties and then two hours back at her hotel conducting more research. However, according to the Alabama section, she also met with "Cricket" at 4 p.m. that day to "set up some properties to look at tomorrow" and then she decided to "tour the area to get a feel for locations of schools, shopping, business/employment". Petitioners report four hours associated with these activities. Finally, according to the Louisiana section, Ms. Prang also managed to spend an additional five hours receiving an inspection report and sending a punch list to Stacie, concluding her 19-hour day.

Two days later, while still in Alabama, Ms. Prang reports another 19-hour day. She reports she began her day by meeting Cricket at 10 a.m. and visiting properties in the area until 4 p.m. From 4 p.m. until 5:30 p.m., Ms. Prang reports she met a representative from Cricket's office and drew up a sale purchase agreement. Thereafter, Ms. Prang reports she had dinner and retired to her hotel for

the evening. She then worked on her computer reviewing properties from 7:30 p.m. until 9:30 p.m. She reported 11.5 hours for this time period in the Alabama section. However, according to the Sage Drive and Loan Info sections, Ms. Prang apparently completed additional work on November 16. The Sage Drive section reports that Ms. Prang spent 30 minutes faxing a document to Janet Montano. According to the Loan Info section, she spent an additional four hours in her hotel room gathering information (a property tax bill, a lease agreement, a brokerage statement, etc.) and sending the information to a mortgage lender. However, a copy of Ms. Prang's email records shows that this information was not sent until 3:13 p.m. the following day--the same time Ms. Prang was on a flight to San Jose, California. Finally, Ms. Prang reports that she spent three hours receiving an inspection report and sending a punch list to Stacie, which appears to be the exact same task reported two days earlier in the Louisiana section.

Ms. Prang reports she met again with Cricket the next morning at 10 a.m., visited properties for four hours, and then boarded a flight to San Jose, California. She arrived in San Jose at 8 p.m. and drove home, reporting a 13-hour day. However, in the Louisiana section, Ms. Prang also reported spending four hours exchanging brief emails with a realtor. While these emails were sent from Ms. Prang's email account, they were each signed "Amir" (Mr. Jafarpour). Finally, Ms.

Prang reported one hour in the Loan Info section relating to her receiving and reading a nine-sentence email.

We are not convinced that Ms. Prang contemporaneously recorded her actions in the real estate log. Petitioners' unreasonable assertions are so pervasive that the entire log is tainted with incredibility. Moreover, petitioners' appointment book is frequently illegible and generally ambiguous. While Ms. Prang may have invested a considerable amount of time in real estate activities during 2006, petitioners' records are simply too unreliable for us to draw any sound conclusion. We are unpersuaded that during 2006: (1) Ms. Prang spent more than one-half of her personal services in real estate activities; and (2) Ms. Prang performed over 750 hours in real estate activities. Therefore, we conclude that petitioners do not meet the requirements of section 469(c)(7)(B), and petitioners' rental activities in 2006 are treated as per se passive under section 469(c)(2).

## IV. Conclusion

We conclude that petitioners are not entitled to a bonus depreciation deduction under section 1400N(d) with respect to their new properties for their 2006 taxable year. Moreover, we conclude that petitioners' real estate losses are passive activity losses and therefore are not deductible against their 2006 active income. In reaching our holdings herein, we have considered all arguments made by

the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent as to the deficiency and for petitioners as to the accuracy-related penalty</u>.