T.C. Memo. 2019-98

UNITED STATES TAX COURT

KENT ALAN WEGENER AND SHINAE WEGENER, Petitioners[1] v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26163-16.                    Filed August 6, 2019.

Kent Alan Wegener, pro se.

Brian A. Pfeifer and Sharyn M. Ortega, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent determined income tax deficiencies against

Kent Alan Wegener (petitioner) and his wife Shinae Wegener for 2011, 2012, and

2013 (years at issue) of $170,953, $98,573, and $21,108, respectively, additions to

---

[1]On September 14, 2018, respondent moved to dismiss Shinae Wegener as a
petitioner for failure to prosecute.  We granted respondent's motion.

[*2] tax for failure to file a timely return under section 6651(a)(1) for 2011 and 2012 of $24,383 and $18,968, respectively, and accuracy-related penalties under section 6662(a) for 2011, 2012, and 2013 of $34,191, $19,715, and $4,222, respectively.[2] Respondent disallowed business expense deductions claimed on Schedule C, Profit or Loss From Business, for each year at issue on the basis that the expenses were not ordinary and necessary business expenses and, alternatively, petitioner did not substantiate the amounts or payment of the expenses.

Following concessions the issues remaining for decision are: (1) whether petitioner is entitled to the disallowed business expense deductions; we hold he is not; and (2) whether petitioner is liable for additions to tax for failure to timely file for 2011 and 2012; we hold he is.[3]

### FINDINGS OF FACT

When petitioner timely filed the petition, he resided in California. The record consists of a stipulation of facts, accompanying exhibits, and trial

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

[3]Respondent conceded the sec. 6662(a) penalties for 2011, 2012, and 2013. Petitioner conceded that he received and failed to report $23,026 of cancellation of indebtedness income in 2013.

[*3] testimony. Petitioner has a master of business administration degree and has worked in corporate finance for over three decades. He began his career at General Electric, where he worked for 18 years and assisted with a number of international finance projects. After leaving General Electric he worked in corporate finance for several other companies including Otis Spunkmeyer (Otis), where he served for 14 years as a vice president of finance. During the years at issue he worked for Otis, receiving an annual salary of over $200,000, and lived in California.

Petitioner and his wife filed joint returns for the years at issue and claimed net loss deductions attributable to Schedule C activities for "Kent's Cocoa llc" (Kent's Cocoa). Despite the name petitioner did not organize a limited liability company. For each year at issue petitioner reported that Kent's Cocoa had no gross receipts and claimed business expense deductions that are the primary subject of this dispute. Petitioner filed one Schedule C for each year at issue and reported his principal business activity was acting as a merchant wholesaler of farm product raw materials. However, he deducted amounts attributable to two separate, unrelated activities: cocoa farming in the Republic of Ghana (Ghana) and aiding African refugees from Ghanaian refugee camps to immigrate to the

[*4] United States including the purported physical transfer of the refugee's money and other assets to the United States (rescue services).

A.    Cocoa Farming

Petitioner had no prior experience with cocoa farming. He first learned about cocoa farming through his employment at Otis, where he was involved in procurement including the procurement of chocolate (produced from cocoa beans) for Otis' baked goods products. In 2007 he began to correspond online with individuals from Ghana about cocoa farming and the cocoa bean bureaucracy in Ghana including the Ghana Cocoa Board, an extension of the Ghanaian Government. He understood that the Ghana Cocoa Board oversaw the process of insecticide treatments for cocoa crops and operated distribution centers through which farmers sold their cocoa beans.

Petitioner's primary means of contact with the farmers was through online chatting and email. However, he traveled to Ghana on multiple occasions and met with members of the Ghana Cocoa Board, farmers, and a lawyer. At times he was suspicious of the individuals he was in contact with online. He performed due diligence including verifying the farmers' identities, the history of their farming activities, the financial conditions of the farms, ownership of the farms, and the market values of the land. He sought to enter into business ventures with farmers

**[\*5]** who were unable to pay previously incurred operating expenses and wages and lacked funding to harvest their current cocoa bean crops, believing that with better management the farms could become profitable.

From October 2009 to October 2010 petitioner entered into at least eight written partnership agreements with Ghanaian farmers. Each agreement was to "form a limited partnership pursuant to the provisions of the Republic of Ghana" and governed by the laws of Ghana (partnership agreements). Had the Ghanaian partnerships engaged in a trade or business, they would have been foreign partnerships under section 7701(a)(4) and (5) and would not have been required to file U.S. returns of partnership income.[4] See sec. 6031(e). Under the agreements the farmers agreed to transfer their assets to the partnerships including land, improvements, unharvested crops, and inventories of salable farm products, and petitioner agreed to make capital contributions to the partnerships ranging from $2,500 to $25,000. At times the agreements were executed after petitioner already had transferred money to the farmers. Petitioner also agreed to lend additional money to the partnerships. The agreements required the partnerships to repay the

---

[4]A foreign partnership that is not required to file a U.S. return is not subject to the provisions of TEFRA. Sec. 6231(a)(1). We refer to the farms as partnerships for convenience and reach no conclusions regarding whether the partnerships or partnership agreements were valid or whether the partnerships engaged in a trade or business.

**[\*6]** loans before calculating and distributing profits to petitioner and the farmers. Under the agreements petitioner received 50% ownership interests in the farms and a right to 50% of the farms' future profits. The agreements provided that the farmers would register the land in both petitioner's and the farmer's names.

The farmers continued to manage the farms' day-to-day operations and had the right to receive salaries if the farm profits were sufficient for their payment. The partnerships also engaged local business managers with annual salaries ranging from $15,000 to $36,000. The partnership agreements stated that the partnerships were obligated to pay the business managers' salaries; however, petitioner paid portions of the salaries himself. Under the terms of the partnership agreements, with limited exception, petitioner had the right to select the business managers. Some partnership agreements named the business managers and stated their salaries.

Petitioner's primary activity with respect to the farming portion of his Schedule C activity was transferring funds to the farmers for their use including uses unrelated to farming. The farmers represented to petitioner that they used the money for their living expenses, transportation of cocoa beans to distribution centers, bribes to have their farms treated with insecticide, which was in short supply, medical expenses of the farmers' relatives, and bail for farmers who were

[*7] arrested for failing to pay their debts such as back wages or amounts owed to the Ghanaian Government. On Schedules C petitioner denoted amounts transferred to the Ghanaian farmers as "monies invested in partnerships": $543,084, $233,396, and $24,513 for 2011, 2012, and 2013, respectively. These amounts included the amounts that petitioner treated as loans and expected repayment of. He also deducted expenses that he personally incurred such as office supplies, banking and money transfer fees, and car expenses.

The partnership agreements provided that the business managers were primarily responsible for maintaining the books and records of the farms. However, the business managers often did not keep records. Neither the farmers nor the managers provided documentation to petitioner. At times, the farmers provided written summaries via email of their activities and expenses.

B.    Rescue Services

Petitioner also deducted business expenses related to his purported rescue services on Schedules C for "monies spent to enter new line of business" of $28,065 and $3,950 for 2011 and 2012, respectively. The Ghanaian Government and the United Nations High Commission for Refugees (UNHCR) established refugee camps in Ghana for persons fleeing conflict and political turmoil in neighboring west African countries. Persons representing themselves as diplomats

[*8] or officials working with the UNHCR contacted petitioner online and asked him to help families from the refugee camps immigrate to the United States. Petitioner's principal means of contact with these individuals was online. He believed that the refugees were former members of an overthrown government or executives of a large diamond company.

As part of the rescue services, the contacts represented to petitioner that the refugee families had substantial wealth and needed assistance with physically transferring their wealth to the United States. The contacts further represented that petitioner would receive a substantial portion of the families' wealth upon their immigration to the United States as compensation for his assistance. Petitioner transferred his own money to his contacts for the purported purpose of paying the expenses incurred to physically transfer the refugees' money to the United States through the delivery and consignment of metal trunks containing cash and/or other assets. He received correspondence with letterheads from the U.S. Customs and Border Protection Services, the United Nations General Assembly, the U.S. Department of Homeland Security, various ministries within the Ghanaian Government, and airport security or storage facilities in California, among others. He received certificates labeled as from the World Bank, the International Monetary Fund, and the Supreme Court of Florida, among others. Petitioner never

[*9] helped anyone successfully immigrate to the United States and did not receive any payment for his services or repayment of the amounts he had advanced. Over the course of at least one year he received emails identifying a series of new obstacles to the delivery of the refugees' money and seeking additional funds allegedly needed to overcome these obstacles to the delivery. Eventually, petitioner told his contacts that he did not have any funds left to advance.

Petitioner began transferring funds to Ghana around 2010; he transferred $187,000 in 2010. He used his salary (over $200,000 annually) and distributions from his individual retirement account (IRA) for the advances. He reported $490,463 in taxable IRA distributions, $47,044 in taxable pension and annuity distributions, and $44,576 in nontaxable pension and annuity distributions on his tax returns for the years at issue. He made wire transfers and incurred wire transfer fees for the years at issue as follows: $524,000 in wire transfers and $10,500 in fees for 2011, $145,000 in wire transfers and $3,600 in fees for 2012, and $21,000 in wire transfers and $1,000 in fees for 2013.

C.    Schedule C Expenses

Petitioner claimed business expense deductions on his Schedules C, which respondent disallowed in their entirety, as follows:

| [*10]  Expense | 2011 | 2012 | 2013 |
|---|---|---|---|
| Car and truck | --- | $110 | $333 |
| Contract labor | $33,276 | 2,000 | --- |
| Depreciation | --- | 30 | --- |
| Nonmortgage interest | 5,000 | 15,000 | 1,000 |
| Legal and professional services | 25,000 | 27,900 | 4,460 |
| Office | 1,000 | 500 | 200 |
| Rent or lease of other business property | 19,000 | 19,000 | 3,200 |
| Supplies | 385 | --- | --- |
| Travel | 5,500 | 6,000 | 890 |
| Utilities | 5,000 | 19,000 | 13,000 |
| Banking fees | 2,000 | 450 | 250 |
| Money transfer fees | 11,500 | 8,440 | 1,422 |
| Money invested in partnerships | 543,084 | 233,396 | 24,513 |
| Money spent to enter new line of business | 28,065 | 3,950 | --- |
| Total | 678,810 | 335,776 | 49,268 |

Respondent disallowed the claimed business expense deductions on the basis that they were not for ordinary and necessary business expenses and alternatively that petitioner did not substantiate the amounts or payment of the

**[*11]** expenses.[5]  Petitioner and his wife filed their 2011 and 2012 joint tax returns late on January 26, 2015, and December 9, 2014, respectively.  Petitioner prepared the returns.  He offered no explanation for their late filing.

OPINION

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving he is entitled to claimed deductions.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving the determinations are in error.  Welch v. Helvering, 290 U.S. 111, 115 (1933).  To that end, a taxpayer must maintain records sufficient to allow the Commissioner to determine his correct tax liability.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  A taxpayer also bears the burden to substantiate the amount and purpose of an expense underlying any claimed deduction.  Higbee v. Commissioner, 116 T.C. 438, 440 (2001).

---

[5]We do not address the issue of substantiation.  We further note that it was petitioner that allegedly paid the amounts that he deducted in connection with the farming activity, not the Ghanaian partnerships.  Significant portions of the deducted amounts were the amounts he transferred as loans and banking and wire transfer fees.  Petitioner asserted that the amounts he transferred to the farmers were loans that he hoped would be repaid.

[*12] I.     Schedule C Deductions

A taxpayer is entitled to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business or for the production or collection of income.  Secs. 162(a), 212(1).  Ordinary expenses are ones that arise by virtue of common or frequent occurrences in the taxpayer's business, and necessary expenses are ones that are appropriate and helpful for the development of the business.  Commissioner v. Tellier, 383 U.S. 687, 689 (1996); Deputy v. du Pont, 308 U.S. 488, 495 (1940).

This case presents a threshold question for the Schedule C business expense deductions:  whether petitioner was engaged in a trade or business or an activity for the production of income with respect to his involvement in the Ghanaian farms or the rescue services that could give rise to deductible expenses under section 162 or 212(1).[6]  Respondent argues that petitioner was not engaged in a trade or business or an activity for the production of income.  We find that petitioner did not engage in a trade or business or an activity for the production of income.

---

[6]Neither party asserts that the expenses are expenses of the foreign partnerships.  Thus, we focus on whether petitioner in his capacity as an individual taxpayer may deduct any of the expenses in dispute.

**[\*13]** A.    Trade or Business

The Code provides no definition for a trade or business.  The Supreme Court has stated:  "[T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit."  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  The question of whether a taxpayer is engaged in a trade or business is inherently factual and "facts vary".  Id. at 36.  For the Court to answer that question in the affirmative the taxpayer must satisfy three requirements:  (1) he undertook the activity intending to earn profit; (2) he is regularly and actively involved in the activity; and (3) the activity has actually commenced.  Jafarpour v. Commissioner, T.C. Memo. 2012-165, slip op. at 14.  Failing to meet any one of these three prongs is dispositive and means that the taxpayer was not engaged in a trade or business.  Id., slip op. at 15.

For regular and active involvement to give rise to a trade or business, the taxpayer must show extensive business activity over a substantial period.  Id.  Sporadic activities, hobbies, and amusement diversions are not enough to establish a trade or business.  Commissioner v. Groetzinger, 480 U.S. at 35.  When determining whether a taxpayer's involvement is regular and active, we consider whether he devoted time to another job.  Jafarpour v. Commissioner, slip op. at 15.

[*14] The taxpayer's management of his own investments is generally not a trade or business.  Whipple v. Commissioner, 373 U.S. 193, 200 (1963); Hatcher v. Commissioner, T.C. Memo. 2016-188, at *12, aff'd, 726 F. App'x 207 (5th Cir. 2018).

### 1. Cocoa Farming

Petitioner has not established that he was sufficiently regularly and actively involved in cocoa farms' operations for it to constitute a trade or business, and it seems improbable that he could have been, given the fact that the farms were across the world and he worked full time as a vice president at Otis.  Rather, he made financial investments in the farms to acquire half of the farmers' assets and lent money to the farmers.  Under the partnership agreements, he received 50% ownership of the land and other assets and the right to 50% of future profits.  He invested in farms that were unable to pay their expenses and did not have sufficient funding to harvest their current crops.  He believed that with better management the farms could be profitable.  The farmers continued to manage the day-to-day operations, but the farms also engaged a business manager often chosen by petitioner.  Petitioner's limited involvement in the farms, primarily wiring money to individuals in Ghana, does not rise to the level of the regular and

[*15] active involvement required to establish a trade or business and deductible business expenses under section 162.

Even if petitioner could establish that his activities constituted a trade or business, he has another problem. He stated that the bulk of his deducted expenses were in fact loans that he expected to be repaid. Transfers made with the expectation of repayment are loans, and we have repeatedly held that they are not deductible business expenses. See Herrick v. Commissioner, 63 T.C. 562, 567 (1975); Canelo v. Commissioner, 53 T.C. 217, 224 (1969), aff'd per curiam, 447 F.2d 484, 485 (9th Cir. 1971). This is true even where the prospect of repayment is doubtful. Merritt v. Commissioner, T.C. Memo. 2003-187, slip op. at 9. Therefore, even if petitioner had established a trade or business, he would not be entitled to deduct the loans under section 162.

Finally, petitioner did not present any documentation of the farms' expenses. He testified that the farmers used the loans for their living expenses, medical expenses, insecticide treatments, transportation costs, bail, and bribes.[7] However, he did not receive any receipts or other documentation from the farmers

---

[7]The farmers purportedly paid bribes to obtain priority for insecticide treatment because there was not enough insecticide to spray all farms. These sorts of illicit payments may be commonplace in other parts of the world and a necessary cost of doing business, but the Code prohibits their deduction. Sec. 162(c)(1).

[*16] or business managers. We do not consider how the farmers used the loans. We are not reviewing the tax years of the foreign partnerships; we are redetermining petitioner's tax liabilities as reported on his returns and the expenses deducted on Schedules C.

### 2. Rescue Services

Petitioner has not shown that he had regular and active involvement with his rescue services and, therefore, has not established that they constitute a trade or business. His rescue service activities consisted solely of wiring money to individuals involved in the refugee scheme in exchange for a larger sum of money to be paid to him later; no money ever arrived. One individual involved in the scheme to whom petitioner had transferred over $140,000 testified at trial via telephone. Petitioner represented that the witness was out of the country and needed to participate by phone. However, during the trial we learned that the witness was in California but he refused to give his exact location to the Court. We find the witness' testimony evasive, unreliable, and lacking any credibility. Petitioner has not shown any regular and active involvement in the rescue service activities. He sent sums of money to unknown persons hoping for a windfall at some point in the future. He appears to be the victim of a scam. We sympathize

**[\*17]** for his situation, but such activity is not a trade or business that gives rise to deductible expenses.

B.  Production of Income

As an alternative position, petitioner argues that his expenses in the farming and rescue services activities are deductible under section 212(1) as ordinary and necessary expenses incurred or paid for the production or collection of income. To deduct expenses under section 212(1) petitioner must establish that he engaged in the activity with the "predominant, primary or principal objective" to realize a profit.  Novak v. Commissioner, T.C. Memo. 2000-234, slip op. at 10; see Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212; Allen v. Commissioner, 72 T.C. 28, 33 (1979) (holding that a taxpayer must engage in an activity predominantly to make a profit); see also sec. 183(a), (c) (disallowing deduction of expenses attributable to activities not engaged in for profit, defined as expenses other than those deductible under section 162 or 212).

Factors we consider in determining whether a taxpayer had the requisite primary profit intent include:  (1) the manner in which the taxpayer carried on the activity, (2) his expertise, (3) the time and effort that he expended in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the taxpayer's success in carrying on other similar or dissimilar

**[\*18]** activities, (6) the activity's history of income or loss, (7) the amount of profit, if any, (8) the taxpayer's financial status, and (9) any elements of personal pleasure or recreation involved. Sec. 1.183-2(b), Income Tax Regs. No single factor is conclusive, and we may accord certain factors greater weight than others. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, 72 T.C. at 34.

Each of these factors weighs against petitioner with respect to both the farming and the rescue services. He engaged in the activities primarily through email and online chat services. He had no expertise in cocoa farming, helping persons immigrate, or transporting large sums of money into the United States. His full-time job limited his ability to be regularly and actively involved in either activity. The activities were structured so that he would have to invest minimal time and effort. His contribution was almost exclusively financial. He had no expectation that the farm's real estate would appreciate in value. He had no success at these or any similar activities; he had no income for the years at issue from these activities and no profit. Petitioner had a substantial IRA and earned an annual salary of over $200,000. It appears his finances suffered as a result of his activities; he reported over $500,000 in IRA and pension distributions for the years at issue. Finally, the record suggests a personal relationship with some

[*19] Ghanaian farmers, indicating elements of personal pleasure or recreation. We find that petitioner did not engage in his cocoa farming or rescue service activities with the primary purpose and intent of making a profit.

### C. Conclusion

Petitioner was not regularly and actively involved in his cocoa farming or rescue services activity. Nor did he engage in these activities with the primary purpose and intent of making a profit. His activities did not give rise to a trade or business for the deduction of expenses under section 162. His alternative position of deductibility under section 212 for the production or collection of income is also without merit. Accordingly, we sustain respondent's determination to disallow the claimed Schedule C expense deductions.

### II. Section 6651(a)(1) Additions to Tax for Failure to Timely File

Section 6651(a)(1) imposes an addition to tax for failing to file a timely tax return. Respondent determined that petitioner is liable for additions to tax for failing to timely file his 2011 and 2012 returns. Respondent has the burden of production and must present sufficient evidence to show the addition to tax is appropriate. Higbee v. Commissioner, 116 T.C. at 446. A taxpayer can avoid the addition to tax if he can show the failure to timely file was due to reasonable cause and not willful neglect. Sec. 6651(a)(1). The taxpayer, however, retains the

**[\*20]** burden of proving that he had reasonable cause. <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447. The parties have stipulated that petitioner filed his joint returns for 2011 and 2012 late on January 26, 2015, and December 9, 2014, respectively. Accordingly, respondent has met his burden of production. Petitioner presented no evidence to show reasonable cause for his late filings. Therefore, respondent's determinations are sustained.

In reaching our holding, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

<u>Decision will be entered under</u> <u>Rule 155</u>.