**379 MADISON AVENUE, Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 310.**

Circuit Court of Appeals, Second Circuit.
July 5, 1932.

Seth B. Robinson, of New York City, for petitioner.

G. A. Youngquist, Asst. Atty. Gen. (Sewall Key and Andrew D. Sharpe, Sp. Assts. to Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and O. J. Tall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Salkin & Korn, of New York City, amicus curiæ.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The taxpayer was incorporated on June 5, 1922, to own, lease, and manage improved or unimproved real estate and to erect, maintain, and manage buildings. It immediately acquired a building lease on property located on Madison avenue in the city of New York, began construction of an office building thereon, and engaged in finding tenants for the building to be erected. The petitioner claims that during the year 1922 its expenses exceeded its income, and it seeks to deduct its 1922 "net loss" from its 1923 income pursuant to section 204 (b) of the Revenue Act of 1921 (42 Stat. 231). This raises the first issue to be considered.

The amount originally claimed by the petitioner as net loss for 1922 was $366.88, and this deduction the commissioner allowed; but before the Board of Tax Appeals and here both parties have changed their positions, the Commissioner denying any statutory net loss and the taxpayer contending that the deduction originally claimed should be increased by nearly $38,000. The items of expense making up this additional sum are rent under the lease, real estate taxes, and interest. The deduction originally claimed represented sundry small items such as $500 for legal expense. All these expenses the Board held could neither be capitalized as a cost of constructing the building, nor deducted as "a net loss resulting from the operation during the taxable year of any trade or business regularly carried on by the taxpayer." The argument is that the petitioner's business was not "regularly" carried on until its building was ready for occupancy (which was about May, 1923); in the meantime, the Board's opinion says, "it was getting ready to operate its business."

With this conclusion we cannot agree. Certainly the corporation was "carrying on business" within the ordinary meaning of that phrase, and within its meaning in section 1000 of the Revenue Act of 1921 imposing a special excise tax with respect to "carrying on or doing business." 42 Stat. 294. See Reg. 64, arts. 11, 12; Associated Furniture Corp'n v. United States (Ct. Cl.) 44 F.(2d) 78. Cf. Flint v. Stone Tracy Co., 220 U. S. 108. 171, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. We see no reason why in section 204 a similar meaning should not be ascribed to the phrase "business regularly carried on," provided the corporate activities have continuity and are of normal character. So much is implied by the word "regularly"; it excludes isolated or unusual transactions. See Auburn & Alton Coal Co. v. United States, 61 Ct. Cl. 438, 444; Bedell v. Commissioner, 30 F.(2d) 622, 625 (C. C. A. 2). In the case at bar, the corporation was continuously engaged in 1922 in carrying on the business for which it was chartered. It not only acquired a leasehold and prosecuted the erection of its building, but it employed real estate brokers, made leases of space to prospective tenants, and collected nearly $50,000 of rentals paid in advance. In improving its real estate, negotiating leases, and incurring the expenses which it seeks to deduct, it was prosecuting its normal activities and was regularly carrying on its business even though that business was not yet at full flower. We think the claimed net loss deductions should have been allowed.

■ The second point relates to rents paid out by the petitioner on account of two leases which it took over by assignment, assuming the obligations of the lessees, in order to procure them as tenants for its own building. In 1923 the rentals paid by the petitioner under such assigned leases exceeded the rental received by reletting the premises by about $38,000. One of the assigned leases ran until January, 1924; the other until April, 1926. The total excess of rentals paid over rentals received until the expiration of the assigned leases was nearly $75,000, and this sum the Board held to be a capital investment, like a commission, made to procure the tenants for petitioner's new building, and to be recouped through pro rata deductions spread over the period of those tenancies. The decision of this court in Bonwit Teller & Co. v. Commissioner, 53 F.(2d) 381, with respect to a brokerage fee paid for securing a subtenant, is relied upon. The analogy is not sound. There the fee was paid for the acquisition of income-producing property, the sublease. Here nothing was paid for acquiring property. It is true that the petitioner took over the assigned leases in order to acquire also the new tenants in its own building. But the rentals paid under the assigned leases were not fees paid to acquire tenants; they were paid to satisfy obligations incident to the assigned leases. The assigned leases were property which the petitioner was authorized to own and operate, and the costs of operating its business included the rentals paid under the assigned leases no less than the rentals paid under its own building lease, just as the income of petitioner included rent received from reletting under the assigned leases as well as rent received under the new leases. No doubt the petitioner's motive in acquiring the assigned leases was a desire to acquire the new tenants, but we do not see that this changes the nature of the transaction. Had each new tenant retained his assigned lease and been allowed by the petitioner a reduction in his stipulated rent for 1923 equal to what he was obliged to pay his old landlord for that year, no one could suppose that such a deduction was a capital investment to earn the stipulated rent. In substance the transaction is the same when the new landlord assumes the obligations of the assigned lease. The Board erred, in our opinion, in not allowing a deduction of the rents paid in 1923 on account of the assigned leases.

■ The final question is whether allowances for amortizing the cost of the building erected upon the leased premises of the petitioner should be based on the original term of the lease, which had only twenty years to run after completion of the building, or on such term plus a renewal period of twenty-one years, since the physical life of the building was found to be forty-one years and either party to the lease had the right to require a twenty-one year renewal. The Board allowed a deduction from 1923 income on account of exhaustion of the investment based on an amortization period of forty-one years; the petitioner contends for an amortization period of twenty years.

The building cost $1,511,590.23, of which $1,000,000 was advanced by the lessor and was to be repaid in annual installments of $50,000 (called the "sinking fund rental"), plus 7 per cent. interest (called the "building rental") on the portion of the advance remaining from time to time unpaid. At the expiration of the original term either party could elect to require the execution of a new lease for a further term of twenty-one years;

the annual ground rent for such renewal period to be 5 per cent. of the value of the land as appraised by arbitrators, but in any event not less than $130,000 per year. Sinking fund rental and building rental would cease at the end of the original term, inasmuch as the $1,000,000 advanced by the lessor would have been repaid by that time.

Section 234 (a) (7) of the Revenue Act of 1921 (42 Stat. 255) permits the deduction of "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." Article 109 of Regulations 62 provides that the cost borne by a lessee in erecting a building on leased premises is a capital investment, and that, in order to return to the lessee his investment, "an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease"; such deduction being in lieu of a deduction for depreciation. The petitioner argues that, in view of article 109, it was error to extend the amortization period beyond the original term of the lease, while the respondent contends that, since either party to the lease had a right to renew, there was a practical certainty that one or the other would find renewal to its advantage and would demand an extension of the term for the additional twenty-one years. Assuming that article 109 does not lay down an inflexible rule for amortizing the cost of a building on leased premises when an extension of the term has already occurred or can be predicted with substantial certainty [see George H. Bowman Co. v. Commissioner, 59 App. D. C. 13, 32 F.(2d) 404, 405; cf. Commissioner v. Pittsburgh Union Stock Yards Co., 46 F.(2d) 846 (C. C. A. 3)], we turn to the petitioner's argument that a renewal in the case at bar is shown to be highly improbable. The petitioner's building was only twelve stories in height, and is not adapted for the erection of additional stories. Subsequently buildings of much greater height were erected in the neighborhood. The value of the land covered by petitioner's building has greatly increased, and as a result of these changed conditions the present building will be valueless by the end of the original term.

As to present conditions, the Board found this evidence to be "thoroughly satisfying," but said that it failed to show that in 1923 it was apparent that the building would have but a short useful life. Accordingly the Board held that depreciation was to be based upon the original term plus the twenty-one year renewal, which together would equal the physical life of the building, forty-one years. But in refusing to give any effect to the testimony that the building would have a useful life much shorter than its physical life we think the Board was in error. It attempted to predict what would occur in the future in respect to the renewal of the lease. Without that prediction there was no excuse for not applying the measure of amortization provided by article 109. In attacking the accuracy of that prediction, we do not see why the taxpayer should be limited to facts which were known in 1923. The issue before the Board is not whether the Commissioner's determination was correct on the evidence before him, but what on the facts presented to the Board is a reasonable allowance for depreciation in the taxable year. Appeal of E. J. Barry, 1 B. T. A. 156; Blair v. Oesterlein Machine Co., 57 App. D. C. 75, 17 F.(2d) 663, 665; B. T. A. v. United States, 59 App. D. C. 161, 37 F.(2d) 442, 443. Cf. Lassen Lumber & Box Co. v. Blair, 27 F.(2d) 17, 19 (C. C. A. 9). If it attempts to determine that issue by looking into what is likely to happen in the future in respect to renewal of the lease, it should be at liberty to get light from events subsequent as well as during the taxable year. Giving weight to the uncontradicted testimony of the real estate expert, it seems highly improbable that either party to the lease will insist upon a renewal at a time when the building upon the property will be unable to earn a return on the value of the ground. That the lessee would be liable in any event for the rental agreed upon does not increase the probability that the lessor will exercise its option to renew where, as here, the ability of the lessee to pay depends almost entirely upon the successful operation of this particular piece of property. Accordingly we think the amortization period should be limited to the expiration of the original term of the lease.

Order reversed, and cause remanded.