# United States Tax Court

T.C. Memo. 2025-51

JAMES M. ROOT AND VALERIE K. ROOT,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 176-22.                                    Filed May 22, 2025.

———————

*Edward C. Duckers*, *Kevin T. Pearson*, and *Michael L. Such*, for petitioners.

*Kara L. Davidson Duyck* and *Catherine J. Caballero*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

TORO, *Judge*: In this deficiency case, petitioners, James M. and Valerie K. Root, contest the Commissioner's disallowance of net operating loss carryovers under section 172[1] for the taxable years 2017 and 2018. They also challenge the determination of an accuracy-related penalty under section 6662(a) for each year.

According to the Roots, the carryovers arose from the 2014 closure or abandonment of a guest lodge on the Roots' property in Klamath County, Oregon. The Commissioner contends that the Roots did not engage in a trade or business, within the meaning of sections 165(c)(1)

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*2]** and 172(d)(4), involving the lodge and therefore that they are not entitled to deductions for losses related to the lodge.

For the reasons discussed below, we find that the Roots did not engage in a trade or business involving the lodge by 2014, and, therefore, they are not entitled to the carryovers claimed for 2017 and 2018.[2] We further find that the Roots are liable for the accuracy-related penalty for each year.

FINDINGS OF FACT

The following facts are derived from the pleadings, the parties' First and Second Stipulation of Facts with attached Exhibits, and testimony admitted into evidence at trial. Mr. and Mrs. Root lived in Oregon when they filed their Petition.

I. *Background on the Roots and the Property*

Mr. and Mrs. Root built a family business into a fruit processing enterprise. Mr. Root came from a family business of fruit growers, packers, and shippers. He attended Oregon State University, where he obtained a degree in food science and technology, and then earned a master's in business administration from Oregon University. Returning to his family's industry, Mr. Root, alongside Mrs. Root, built up Sabroso, a fruit puree company. Mr. Root worked at Sabroso for 33 years; he and Mrs. Root owned and operated it together for 20 years. The Roots sold Sabroso in 2008.

More than a decade before selling Sabroso, the Roots began to develop ideas for a recreational ranch in Oregon. A ranch would merge the Roots' interests—Mr. Root loved to fish, and Mrs. Root enjoyed

---

[2] The Roots argue for the first time in their reply brief that their losses are also deductible under section 165(c)(2), which provides a deduction for losses incurred in a transaction entered into for profit. By failing to raise this argument in their opening brief, the Roots have forfeited it, and the Court will not consider it. *See Considine v. Commissioner*, 74 T.C. 955, 969–70 (1980) (declining to consider an argument first advanced in a reply brief because it was "untimely"); *see also Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007) (stating that the parties "waived [an] argument by raising it for the first time in their reply brief"); *Alterman v. Commissioner*, T.C. Memo. 2018-83, at *29 (concluding that the taxpayers were not entitled to a deduction when they failed to "properly brief" the issue). The argument would not appear to help the Roots in any event. *See Todd v. Commissioner*, 77 T.C. 246, 248–49 (1981), *aff'd per curiam*, 682 F.2d 207 (9th Cir. 1982); *see also infra* Opinion Part II.

[*3] equestrian activities, cooking, and other ranch-related activities. As Mr. Root explained at trial:

> I had developed a keen interest in fly fishing, and my wife was raised on a smaller farm cattle ranch, and she brought the horsemanship and working dog experience. We married those two ideas for what we thought would be a multi-purpose natural resource lodge.

Tr. 26.

In 1995 and 1998, the Roots purchased two parcels of land in Klamath County. The properties included a pasture, farmland, and waterways. After purchasing the land, the Roots took steps to make improvements, including restoration of the waterways for fishing. In or around 2002, the Roots purchased two additional parcels of land. The first included a 76-acre parcel, known as the Klamath Agency property, which housed historic buildings. The second, a 10-acre parcel, included a residence where the Roots primarily stayed when on the ranch. We refer to all four parcels, taken together, as the property.

## II. *Construction of the Lodge and Discovery of Problems*

In September 2000, the Roots entered into an agreement with Larry Pearson, A.I.A., P.C., to act as the architect for a "Lodge/Residence (including a semi-attached guest wing and a semi-attached council house)" and a barn on the property. Ex. 11-J, at 1. Construction began after June 2003, when the Roots entered into a residential construction agreement with J.E. Simpson Construction, a local contractor. The scope of work under that agreement included the "construction of the main house, the council house, [and] the garage." Ex. 14-J, at 21.[3] When construction on the lodge[4] began, the property was zoned solely for farm use. Commercial construction on the property was prohibited without permission from the county.

---

[3] The scope of work also included a reference to a "guest/bunk house," but an addendum to the agreement appears to have excluded the "guest house" from the scope of work. Ex. 14-J, at 22.

[4] The Commissioner maintains that the structure was intended to be a house for the Roots' personal use. The Roots, by contrast, maintain that the structure was intended for business use. Although at trial Mr. Root frequently referred to the structure as the house, in view of our disposition, we need not resolve the parties' factual dispute on this point. Our use of the term "lodge" should not be understood otherwise.

**[\*4]**    In April 2005, the Roots entered into a contract with Peace Design under which the company agreed to provide "services . . . [in connection] with the interiors of your new home." Ex. 13-J, at 1.  Later in 2005, the Roots obtained a personal homeowner's policy to cover the lodge for the period from September 30, 2005, through September 30, 2006.  They added fine art and jewelry coverage to the policy on January 9, 2006.  The homeowner's policy was subsequently renewed for two additional years.

In May 2006, the lodge received a certificate of completion.  But shortly after the construction was completed, things began to go awry.  By the end of 2006, snow and rain caused the lodge to flood, revealing defects in its windows, roofing, and weatherproofing.  In 2007, the Roots discovered hundreds of bats living in the walls of the lodge, along with rats and mice.  The infestations caused a foul odor within the lodge.  Later, it also became clear that the foundation of the lodge was defective.

The Roots eventually hired a forensic architect to evaluate the lodge.  In the course of his work, the forensic architect found that the lodge's main fireplace was structurally unsound.  The large boulders used in the fireplace were simply stacked on top of each other.  The rebar that should have been included in the structure was omitted, putting users of the lodge at great risk in the event of an earthquake.  The forensic architect reported the fireplace defect to Klamath County.  In 2010, after receiving reports of the defects and inspecting the property, county officials condemned the lodge as unsuitable for occupancy.

III.    *Conditional Use Permit for Additional Future Construction*

After they discovered some of the defects at the lodge, but before the lodge was condemned, the Roots still hoped to remediate the lodge's construction problems.  They also hoped to expand the structures on the property.  In 2009, they obtained a conditional use permit from the Klamath County Planning Department to build additional structures on the property near the existing lodge.  The permit referred to the existing lodge as a "dwelling" on an "existing cattle ranch."  The permit, as amended, would have allowed an additional building with up to 20 guest rooms, alongside a new barn, parking, and other functional necessities.  The structures contemplated in the permit were never built.

[*5] IV.    *Condemnation of the Lodge and Aftermath*

After the lodge was condemned in 2010, the Roots eventually lost faith in the project. The lodge was subsequently demolished, although the record is unclear as to when the demolition occurred.

V.    *Litigation Concerning the Construction of the Lodge*

Once the lodge's construction defects became apparent, the Roots pursued litigation to recover their losses. In 2009, the Roots filed a demand for arbitration against Larry Pearson, A.I.A., P.C., and J.E. Simpson Construction. The Roots and Larry Pearson settled in 2011, in an agreement that referred to the lodge as a "high-end custom home." Ex. 28-J, at 1. The Roots also reached a settlement with J.E. Simpson Construction.

Then, in 2011, the Roots filed complaints against the various subcontractors involved in the construction of the lodge. The Roots received a favorable judgment and monetary award in 2014.

While litigating, the Roots did not seek to recover business losses or damages related to a business. Ultimately, the Roots recovered approximately $3 million through arbitration and litigation but paid approximately $4 million in legal fees.

VI.    *Activities on the Property*

The lodge never hosted overnight guests. As Mr. Root pointed out, when asked at trial why the Roots never obtained an innkeeper's license for the lodge: "We didn't have a viable structure to keep guests. We hadn't gotten that far." Tr. 55. Mrs. Root echoed the same point when asked whether the Roots had hospitality software to check in guests. She candidly replied, "No, we weren't that far along. We would have had to have that." Tr. 82.

The Roots did, however, sporadically host events on the property. Before building the lodge, they hosted ESPN's "Fly Fishing of the World" television show and two Crater Lake National Park fundraising events. They also hosted the National Amateur Retriever Dog Trials. After construction was completed, and while they were finding defects at the lodge, they held a fundraiser for the National Fish and Wildlife Foundation, two horse reining competitions, and an open house for local fishing guides, anglers, and hunters. The Roots also opened the property twice to birders from a local nature conservancy. All told,

[*6] between 2002 and 2009, the Roots held about a dozen events on the property, none of which involved stays at the lodge. These events were by invitation only. The record reflects no payments to the Roots for these events.

In addition to hosting occasional events, the Roots once donated a stay at the lodge to the Jackson Hole One Fly Foundation. Because the lodge was uninhabitable, however, the recipients stayed at the Roots' personal residence.

The Roots did not engage in any television or print advertising for the lodge. They did not hire employees for the lodge, purchase hospitality software, or build a website to book stays. They had no innkeeper's or food handler's license.

VII. *Tax Returns and Examination*

The Roots filed Form 1040, U.S. Individual Income Tax Return, for taxable year 2014 on October 8, 2015. On the Form 1040, Mr. Root's occupation was described as "CEO" and Mrs. Root's as "Retired." The return included Schedule C, Profit or Loss From Business, that listed Mr. Root's principal business as "Root Properties LLC," a consulting business (according to the business code the Roots provided in box B) using the name "Jim Root & Company."[5] The Schedule C reflected over $300,000 of gross receipts and approximately $10,000 of net profit. The Schedule C did not mention any hospitality activities or reflect any losses related to the Roots' lodge.

In May 2018, the Roots filed Form 1040X, Amended U.S. Individual Income Tax Return, for 2014, claiming a loss under sections 165 and 167 of $5,147,035. They calculated this amount by adding together the total design and construction costs of the lodge and the legal fees associated with the subsequent litigation, and then subtracting the recovery from litigation and settlements. Jamie M.

---

[5] The Roots had registered the business name "The Root Ranch" with the State of Oregon in 1999, but the record does not show a business by that name being listed in any Schedules C filed with the federal income tax returns for taxable years before 2014. We note that State of Oregon registry of business names lists the principal place of business for The Root Ranch at a slightly different address (the street number is shown as 42025) from the address where the lodge was located (the street number for the lodge was 42020). We cannot tell from the record what precisely was located at the first address (i.e., No. 42025).

**[\*7]** Rayburn, a certified public accountant with Rayburn & Rayburn, LLP, CPAS, prepared the amended return.

The Roots filed Forms 1040 for the taxable years 2017 and 2018. On their 2017 return, the Roots claimed a net operating loss carryover from 2014 of $3,738,774. On their 2018 return, they claimed a net operating loss carryover from 2014 of $3,305,040.

The Commissioner examined the Roots' 2017 and 2018 returns. At the conclusion of the examination, the Commissioner issued a Notice of Deficiency disallowing the claimed net operating loss carryovers in full and determining a deficiency for each year. In addition, the Commissioner determined a 20% accuracy-related penalty under section 6662(a) for each year.[6] Before the issuance of the Notice of Deficiency, the revenue agent assigned to the Roots' examination made the initial determination to assert penalties against the Roots, and that determination was approved, in writing, by the revenue agent's immediate supervisor.

The Roots timely petitioned our Court for redetermination.

OPINION

I.  *Burden of Proof*

The Commissioner's determinations in a Notice of Deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Merkel v. Commissioner*, 192 F.3d 844, 852 (9th Cir. 1999), *aff'g* 109 T.C. 463 (1997). The taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the Code authorizes the deduction and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

---

[6] The Commissioner determined that section 6662 applied because the Roots had an underpayment attributable to a substantial understatement of income tax under section 6662(b)(2). In the alternative, the Commissioner determined that the underpayment was attributable to negligence or disregard of rules or regulations within the meaning of section 6662(b)(1).

**[\*8]**    If the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets certain other requirements, the burden of proof shifts to the Commissioner as to that issue.  I.R.C. § 7491(a)(1) and (2).  The Roots do not seek, and the record does not support, a shift in the burden of proof here.

II.    *Net Operating Loss Carryover Deductions*

Section 172(a) allows as a deduction for a taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to that year and (2) the net operating loss carrybacks to the year.  *See Metro One Telecomms., Inc. v. Commissioner*, 704 F.3d 1057, 1059–60 (9th Cir. 2012), *aff'g* 135 T.C. 573 (2010).  Section 172(c) defines a net operating loss as the excess of deductions over gross income, computed with certain modifications specified in section 172(d).  *See, e.g.*, *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 825 (2001); *Metro One Telecomms., Inc. v. Commissioner*, 704 F.3d at 1060; *Keith v. Commissioner*, 115 T.C. 605, 620 (2000) (reviewed).  Specifically, with respect to individuals, section 172(d)(4) limits the net operating loss deductions which are not attributable to a trade or business.  "As a result of subsections (c) and (d) of section 172, the basic category of an individual's losses that may constitute net operating losses is losses from the conduct of a trade or business."  *Laney v. Commissioner*, T.C. Memo. 1997-403, 1997 WL 563381, at \*13, *aff'd*, 168 F.3d 482 (4th Cir. 1999).

"A taxpayer who claims a net operating loss deduction bears the burden of establishing both the existence of the net operating loss and the amount that may be carried over to the year involved."  *Chico v. Commissioner*, T.C. Memo. 2019-123, at \*39 (citing *Keith*, 115 T.C. at 621), *aff'd*, No. 20-71017, 2021 WL 4705484 (9th Cir. Oct. 8, 2021).  Moreover,

> [i]t is well settled that we may determine the correct amount of taxable income or net operating loss for a year not in issue (whether or not the assessment of a deficiency for that year is barred) as a preliminary step in determining the correct amount of a net operating loss carryover to a taxable year in issue.

*Lone Manor Farms, Inc. v. Commissioner*, 61 T.C. 436, 440 (1974), *aff'd*, 510 F.2d 970 (3d Cir. 1975) (unpublished table decision).

**[\*9]** "Taxpayers cannot rely solely on their own income tax returns to establish the losses they sustained." *Barker v. Commissioner*, T.C. Memo. 2018-67, at \*13 (citing *Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979)), *aff'd*, 853 F. App'x 571 (11th Cir. 2021). "To meet [their] burden [the Roots] must introduce convincing evidence that [they] incurred [a net operating loss] in the taxable [year 2014] . . . ." *See Amos v. Commissioner*, T.C. Memo. 2022-109, at \*7 (quoting *Power v. Commissioner*, T.C. Memo. 2016-157, at \*14), *aff'd*, No. 23-10532, 2024 WL 1406646 (11th Cir. Apr. 2, 2024).

The Roots assert that the losses they incurred with respect to the lodge were losses incurred in a trade or business and were deductible for 2014 under section 165(c)(1). For the reasons stated below, we find that the Roots were not engaged in a trade or business within the meaning of section 165(c)(1) by 2014. Accordingly, they were not entitled to a deduction under section 165(c)(1) for the losses they claimed for that year and had no net operating loss to carry over to 2017 and 2018.

### A. *Legal Background: Losses Incurred in a Trade or Business*

Section 165 generally allows taxpayers to deduct unreimbursed losses sustained during the taxable year. I.R.C. § 165(a). For individual taxpayers, section 165(c) limits the deduction to three categories of losses: (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) certain casualty losses. To deduct a trade or business loss under section 165(c)(1), a taxpayer must be engaged in a trade or business. *See Weston v. Commissioner*, T.C. Memo. 2025-16, at \*11; *Sandoval v. Commissioner*, T.C. Memo. 2010-208, 2010 WL 3719257, at \*3.

Neither the Code nor the regulations provide a generally applicable definition of the term "trade or business." *Commissioner v. Groetzinger*, 480 U.S. 23, 27 (1987). "Determining the existence of a trade or business 'requires an examination of the facts in each case.'" *Estate of Morgan v. Commissioner*, T.C. Memo. 2021-104, at \*13–14 (quoting *Commissioner v. Groetzinger*, 480 U.S. at 36).

The Supreme Court and our Court have applied the same standard under both section 162(a) and section 165(c)(1) to determine whether a trade or business exists. *See United States v. Generes*, 405 U.S. 93, 103 (1972) (discussing the consistency of the meaning of "trade or business" across sections 162, 166, and 165); *see also Bick v.*

**[\*10]** *Commissioner*, T.C. Memo. 1978-390, 37 T.C.M. (CCH) 1591, 1593. The U.S. Court of Appeals for the Ninth Circuit, where this case would ordinarily be appealable, *see* I.R.C. § 7482(b)(1), has also indicated that the term "trade or business" carries a uniform meaning across sections 162(a) and 165(c)(1), *see DePinto v. United States*, 585 F.2d 405, 408 (9th Cir. 1978); *Hirsch v. Commissioner*, 315 F.2d 731, 736–37 (9th Cir. 1963), *aff'g* T.C. Memo. 1961-256.[7]

In examining the facts of each case to determine the existence of a trade or business we have focused on three factors. *Estate of Morgan*, T.C. Memo. 2021-104, at \*14. First, the taxpayer must undertake an activity intending to earn a profit; second, the taxpayer must be regularly and actively engaged in the activity; and third, the taxpayer's business activities must actually have commenced. *See, e.g.*, *id.* (first citing *Weaver v. Commissioner*, T.C. Memo. 2004-108, 2004 WL 938293, at \*6; and then citing *McManus v. Commissioner*, T.C. Memo. 1987-457, 54 T.C.M. (CCH) 475, 479–80, *aff'd*, 865 F.2d 255 (4th Cir. 1988) (unpublished table decision)). Failing to satisfy any of these requirements is dispositive. *Wegener v. Commissioner*, T.C. Memo 2019-98, at \*13 (citing *Jafarpour v. Commissioner*, T.C. Memo. 2012-165, slip op. at 15).

---

[7] The Roots resist uniformity between sections 162(a) and 165(c)(1), arguing that, because section 162(a) requires expenses to be incurred in the "carrying on" of a trade or business, it imposes additional requirements compared to section 165(c)(1). As a result, they argue, they qualify for a 165(c)(1) loss even if they did not "carry on" a trade or business. The decisions discussed in the text, from the Supreme Court, the Ninth Circuit, and our Court, do not support this line of argument.

The Roots also highlight section 195 as a potential indicator that section 165 does not require a trade or business to have commenced. Section 195 requires taxpayers to capitalize startup expenditures. Taxpayers may elect to deduct up to $5,000 in startup expenditures "for the taxable year *in which the active trade or business begins*" and the remainder over 15 years. I.R.C. § 195(b)(1) (emphasis added). If a taxpayer disposes of the business before the end of the 15-year period, the taxpayer may be able to deduct the remaining deferred expenses as a loss under section 165. I.R.C. § 195(b)(2). On the Roots' reading, section 195(b)(2) contemplates a section 165 deduction for expenses incurred before a trade or business commences. But section 195(b)(1) provides a deduction beginning only in the year in which a trade or business begins. And section 195(b)(2) contemplates an additional section 165 deduction only "to the extent allowable under section 165." Read in harmony, sections 195 and 165 both contemplate that a trade or business will have commenced by the time a taxpayer deducts startup expenses. *See Estate of Morgan*, T.C. Memo. 2021-104, at \*15–16, \*21 n.9.

**[\*11]** B.    *Whether the Roots' Business Activities Actually Commenced by 2014*

We begin our analysis by considering the third factor, which addresses timing. The following oft-quoted test offers guidance:

> [E]ven though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized.

*Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965), *vacated and remanded on other grounds per curiam*, 382 U.S. 68 (1965); *see also Madison Gas & Elec. Co. v. Commissioner*, 72 T.C. 521, 566 (1979) (concluding that *Richmond Television Corp.* was correctly decided), *aff'd*, 633 F.2d 512 (7th Cir. 1980).

That is, "a taxpayer must show 'more than initial research into or investigation of business potential' to cross the threshold into 'carrying on a trade or business.'" *Estate of Morgan*, T.C. Memo. 2021-104, at \*14 (quoting *Glotov v. Commissioner*, T.C. Memo. 2007-147, 2007 WL 1702618, at \*2). "Crossing that threshold does not require that the business succeed, but [the taxpayer] must engage in business." *Id.* at \*15 (citing *Cabintaxi Corp. v. Commissioner*, 63 F.3d 614, 620–21 (7th Cir. 1995), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 1994-316).

As we have observed before, "[t]he taxpayer must make the preliminary choices of whether to enter into business and which business to enter. If the taxpayer has not made these choices, at the most he is still incurring investigatory costs." *Id.* at \*17. Once the taxpayer makes these choices, the next step is getting the business to "function as a going concern and perform[] those activities for which it was organized." *Richmond Television Corp.*, 345 F.2d at 907. This is the step that allows the taxpayer to claim a deduction under section 165. *See Estate of Morgan*, T.C. Memo. 2021-104, at \*17.

A taxpayer's business need not generate revenue for the business to have commenced, but the business must perform the activities for which the venture was organized. *See Cabintaxi Corp. v. Commissioner*,

[*12] 63 F.3d at 620. In *Cabintaxi*, the U.S. Court of Appeals for the Seventh Circuit held that a corporation organized to sell and install automated transportation systems, and which had made an effort to sell systems to North American cities, was in the trade or business of distributing such systems. *Id.* Even though the corporation had not successfully sold its product, the Seventh Circuit determined that the corporation's agreement to sell, coupled with bona fide efforts to do so, caused the business to commence. *Id.* at 620–21 (citing *McManus*, 54 T.C.M. (CCH) at 481).

We have previously addressed whether abandoned lodgings that were never completed such that they could be offered to tenants could generate losses from a trade or business. In *Todd*, 77 T.C. at 246–47, a taxpayer purchased land in Long Beach, California, and hired contractors to develop plans for an apartment building. High interest rates caused the taxpayer to postpone construction, and eventually Long Beach rezoned the property so that the taxpayer could not build. *Id.* at 247. The taxpayer then sought to deduct losses stemming from payments to the contractors as well as payments for permits and licenses. *Id.* We held that because the taxpayer's "plans to enter the business of renting apartments were never realized . . . the loss incurred as a result of the abandonment of those plans was not attributable to a trade or business." *Id.* at 250. The Ninth Circuit affirmed our decision "[e]ssentially upon the basis of the Tax Court's opinion." *Todd v. Commissioner*, 682 F.2d at 208.

The Roots' lodge endeavor closely tracks that of the taxpayer in *Todd*. Although the Roots did complete some construction on their property, the lodge was never brought to a state in which guests could stay or tenants could rent it. As the Roots themselves agree, "the Lodge was never in a condition in which it could be used to provide exclusive upmarket lodging for paying guests." Pet'r's Op. Br. 21; *see also* Tr. 55 ("We didn't have a viable structure to keep guests. We hadn't gotten that far."). Even if it had been suitable to house guests, the Roots never opened the lodge up to potential guests.

Further, throughout its existence, the lodge lacked the tools and infrastructure to accept customers. There was no website or booking portal for the lodge. The kitchen did not have the necessary permitting to offer food to customers. And there was no system for billing any lodge guests. Beyond just lacking revenue, the Roots' lodge was never capable of operating as a business. *See Richmond Television Corp.*, 345 F.3d at 907; *cf. Cabintaxi Corp. v. Commissioner*, 63 F.3d at 620–21. Simply

**[\*13]** put, the Roots never realized their plans of operating a guest lodge on their property.

Moreover, we held in *Todd*, 77 T.C. at 250, that the "policy underlying the enactment of the net operating loss provisions supports the conclusion that [Mr. Todd's] venture did not constitute a trade or business for purposes of section 172(d)(4)." Section 172 allows a business "to set off its lean years against its lush years." *Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386 (1957). But the Roots had no lush years, because they never began to operate their lodge as a going concern. As in *Todd*, the Roots' "plans to construct [their lodge] did not even advance to the point where the venture could offer the potential to produce profits or losses . . . . At the time [the Roots] abandoned this venture, the loss[es] [they] suffered could not be considered anything other than the product of an investment that went awry." *See Todd*, 77 T.C. at 251. Sections 165 and 172 do not support deductions for such losses.

The Roots resist the conclusion that their planned lodge business never began. They offer several potential times when they claim their business commenced, ranging from 1995, when they purchased the land, to 2009, when they obtained the conditional use permit to undertake additional construction on the property. We take these in turn.

First, the Roots suggest that the business began in 1995 when they purchased the land and had the idea to open a guest lodge. This plainly fails to meet the standard set out in *Richmond Television Corp.* The Roots claimed they planned to open a guest lodge to house overnight guests. Certainly, such a business could not "perform[] those activities for which it was organized" before construction on any housing had begun. *See Richmond Television Corp.*, 345 F.2d at 907; *see also Todd*, 77 T.C. at 250 (finding that no trade or business existed when construction on apartment building had not begun and therefore apartments could not be rented); *Goodwin v. Commissioner*, 75 T.C. 424, 439 (1980) (holding that two partnerships formed to build and operate low-income housing were not carrying on trade or business before projects were completed and tenants moved in), *aff'd*, 691 F.2d 490 (3d Cir. 1982) (unpublished table decision).

On brief, the Roots maintain that "a trade or business can begin as early as the purchase of the property that will be used in the trade or business." Pet'r's Op. Br. 16. They cite *Woody v. Commissioner*, T.C.

**[\*14]** Memo. 2009-93, 97 T.C.M. (CCH) 1484, *aff'd*, 403 F. App'x 519 (D.C. Cir. 2010), as support. The Roots' reliance on *Woody* is misplaced.

To start, *Woody* held that the taxpayer was *not* engaged in a trade or business when he incurred the expenses at issue before the Court. *Id.* at 1487–88. Given its disposition, the case can offer no *holding* as to what might be sufficient to constitute a trade or business.

But even apart from this doctrinal point, the Roots misread the case. It is true that the Court observed (as the Roots note) "that Mr. Woody's activities did not rise to the level of a trade or business until, at the earliest, the time he purchased the Randolph Street property on December 30 of the year in suit." *See id.* at 1487. That formulation, taken out of context, might be read to suggest that the mere purchase of property to be used in a trade or business might suffice to commence a trade or business. But both the phrase "at the earliest" and the very next sentence in *Woody* cast significant doubt on that inference. Immediately after the sentence the Roots quote, the Court stated:

> More likely, Mr. Woody's activities did not rise to the level of a trade or business until he held the Randolph Street property out for rent sometime after the close of the year in suit. *See Charlton v. Commissioner*, 114 T.C. 333, 338 (2000) (holding that the mere purchase of property did not constitute an active trade or business since the property was not rented or held out for rent until a subsequent year).

*Id.* In short, a careful reading of *Woody* undercuts, rather than supports, the Roots' position here.

Second, the Roots suggest that their trade or business started in 2003, once they had hired an architect and contractor and had begun developing the lodge. This suggestion also runs against the *Richmond Television Corp.* standard, for the same reasons as those that apply to the 1995 date. *See Richmond Television Corp.*, 345 F.2d at 907; *Todd*, 77 T.C. at 250. While the lodge was being designed and built, the purported business could not have performed the purpose for which it was organized. *See Todd*, 77 T.C. at 250; *see also Madison Gas & Elec. Co.*, 72 T.C. at 566–67 (rejecting an argument that the issuance of a construction permit marked the commencement of a trade or business).

The Roots rely on *379 Madison Ave., Inc. v. Commissioner*, 60 F.2d 68 (2d Cir. 1932), *rev'g* 23 B.T.A. 29 (1931), for the proposition that a project need not be finished or fully utilized for its intended purpose

**[\*15]** for a trade or business to exist. We have no quarrel with that general proposition. But the Roots overread *379 Madison Avenue.* The taxpayer in that case had "not only acquired a leasehold and prosecuted the erection of its building, but it employed real estate brokers, made leases of space to prospective tenants, and collected nearly $50,000 of rentals paid in advance." *Id.* at 69. The Roots' activities here fall far short of those of the taxpayer in *379 Madison Avenue. See id.*; *see also Todd*, 77 T.C. at 250 n.4 (distinguishing *379 Madison Avenue* on similar grounds).

Third, the Roots propose 2006, when they hosted an open house at the lodge, as a possible opening time. We have held that, in the guest housing industry, free hosting is insufficient to satisfy the commencement criterion. *See Baldwin v. Commissioner*, T.C. Memo. 2002-162, 2002 WL 1377741, at \*12–14. Unlike the activities in *Baldwin*, the Roots' open house did not even amount to free hosting: Their lodge never hosted overnight guests at all. And the record offers no support for the view that the lodge was held open to the public or became capable of developing into a revenue-producing business after the open house. At bottom, the lodge was never capable of hosting paying guests. *See Todd*, 77 T.C. at 250.

Fourth and finally, the Roots point to the period in 2009 when they obtained a conditional use permit for the property as the latest timeframe the business began. While failure to obtain a required license may be evidence that a trade or business is not yet viable, obtaining a license is usually insufficient to demonstrate that a business has commenced. *See Jackson v. Commissioner*, 864 F.2d 1521, 1526 (10th Cir. 1989) ("Merely possessing the legal capability to sell . . . by obtaining a license . . . without actual efforts to sell the products[] is insufficient to constitute carrying on a trade or business for purposes of section 162."), *aff'g* 86 T.C. 492 (1986); *Estate of Miller v. Commissioner*, T.C. Memo. 1991-515, 62 T.C.M. (CCH) 997, 1008 (stating that a lack of licensure demonstrates a business's inability to have commenced), *aff'd*, 893 F.2d 232 (5th Cir. 1993); *see also Estate of Morgan*, T.C. Memo. 2021-104, at \*18–20 (following *Jackson v. Commissioner*, 864 F.2d at 1526). In the Roots' case, the issuance of the conditional use permit did not signal that the business was up and running. *See Estate of Morgan*, T.C. Memo. 2021-104, at \*18–20. The permit allowed the Roots to construct on the property a new building with up to 20 guest rooms, as well as a barn. The new guest ranch building, independent of the existing lodge, was never built. Nor is there any evidence to suggest that, once the Roots obtained their permit, the lodge opened to the public or began

**[\*16]** performing "those activities for which it was organized." *See Richmond Television Corp.*, 345 F.2d at 907.

To summarize, although the Roots hosted some events on their property between 1995 and 2009, none of them included overnight stays at the lodge. Even when the Roots donated an overnight stay at their lodge, the guests ultimately stayed on another location on the property. Hosting on the property was occasional and isolated and insufficient to demonstrate the operation of a guest lodge. *See Baldwin v. Commissioner*, 2002 WL 1377741, at \*14.

Because the Roots' business activities with respect to the lodge did not commence by 2014, their lodge-related losses were not incurred in a trade or business for purposes of section 165(c)(1).

C.   *Whether the Roots Were Regularly and Actively Engaged in the Lodge Activity*

We turn next to the second factor. As already noted, a taxpayer must engage in an activity with continuity and regularity to show that the activity rises to the level of a trade or business. *Commissioner v. Groetzinger*, 480 U.S. at 35. To prove regular and active involvement, a taxpayer must show "extensive business activity over a substantial period as opposed to a one-time venture or investment." *Jafarpour*, T.C. Memo. 2012-165, slip op. at 15 (first citing *Stanton v. Commissioner*, 399 F.2d 326, 329–30 (5th Cir. 1968), *aff'g* T.C. Memo. 1967-137; and then citing *McManus*, 54 T.C.M. (CCH) 475). Sporadic activities do not meet the level of activity required for the existence of a trade or business. *Commissioner v. Groetzinger*, 480 U.S. at 35. Evidence that the taxpayer was engaged in other jobs or businesses is also relevant, though it does not necessarily preclude the existence of a trade or business. *See Wright v. Commissioner*, 31 T.C. 1264, 1267 (1959), *aff'd per curiam*, 274 F.2d 883 (6th Cir. 1960).

Even if we were to assume (just for the sake of our analysis) that the Roots' lodge activity had actually commenced before the lodge's demolition, the Roots were neither regularly nor actively engaged in the activity during that period.

At trial, the Roots described a small number of events held on their property while the lodge was being constructed and shortly thereafter. They did not, however, present any evidence regarding the amount of time or attention these events required for planning, preparation, and hosting. Given how infrequently the events occurred,

**[\*17]** it seems doubtful that they would have required regular involvement on par with that required to conduct a trade or business. Nor did the Roots demonstrate regular involvement in another manner, such as by showing that they had hired employees to undertake business activities on their behalf.

Further, during the acquisition of the property and the construction of the lodge, the Roots owned and operated a fruit processing business, Sabroso. They sold Sabroso in 2008, roughly two years after the lodge received a certificate of completion. Presumably, owning and operating an active business took substantial time and attention from the Roots. But the Roots have not demonstrated how they allocated their time between Sabroso and the lodge during the years of construction.

And after the 2008 sale of Sabroso—when the Roots might have had more time to devote to the lodge—Mr. Root continued serving as the chief executive officer of Jim Root & Co. Moreover, by that time, the lodge's defects had become apparent. Beyond their activities in pursuing construction remediation and ultimately recovery for their losses, the Roots have not shown that they were regularly and actively engaged in the running of the lodge, either before or after selling their other business.

The Roots thus have failed to meet their burden to show regular and active engagement in lodge-related endeavors. As a result, even if the lodge activity had commenced by 2014, it did not constitute a trade or business of the Roots.

D.    *Conclusion on Net Operating Loss Carryovers*

In short, we cannot find that the Roots entered into a trade or business with respect to their lodge by 2014. In addition, even assuming for the sake of analysis that the lodge business did commence at some point after the lodge received a certificate of completion, the Roots nevertheless failed to demonstrate that they were regularly and actively involved with the lodge at the level of a trade or business.[8] Consequently, they may not deduct their losses under section 165(c)(1) and have failed to establish the existence of a net operating loss for 2014.

---

[8] In view of these conclusions, we need not decide whether the Roots undertook the activities here intending to earn a profit (the first requirement discussed in Opinion Part I.A).

**[\*18]** As a result, they have no net operating loss carryovers from 2014 into their 2017 and 2018 taxable years.

III.    *Accuracy-Related Penalties*

Section 6662(a) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a return that is attributable to any substantial understatement of income tax.  *See* I.R.C. § 6662(a), (b)(2).  An understatement of income tax is "substantial" if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or "$5,000."  I.R.C. § 6662(d)(1)(A).

The penalty for a substantial understatement of income tax applies to any portion of an underpayment in a carryover year that is attributable to a "tainted item" in the year the carryback loss arose (loss year).  Treas. Reg. § 1.6662-4(c)(1).  The determination of whether an understatement is substantial for a carryover year is made with respect to the return of the carryover year.  *Id.*  "Tainted items" are taken into account with items arising in a carryover year to determine whether the understatement is substantial for that year.  A "tainted item" generally is any item for which there is neither substantial authority nor adequate disclosure with respect to the loss year.  *Id.* subpara. (3)(i).[9]

Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of an individual for any penalty.  *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).  The record shows that the Roots' understatements of income tax for 2017 and 2018 exceeded the threshold amount under section 6662(d)(1)(A), so the Commissioner has met the burden of production.

The Commissioner must also show compliance with the procedural requirements of section 6751(b)(1).  *See* I.R.C. § 7491(c); *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1072–74 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *see also Kraske v. Commissioner*, 161 T.C. 104, 111 (2023) ("We accordingly hold that *Laidlaw's Harley Davidson* is squarely on point, and pursuant to the *Golsen* doctrine we will follow it in this case.").  *See generally Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).  Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of the assessment was

---

[9] The Roots make no argument with respect to adequate disclosure, so we do not discuss this aspect of the regulation further.

**[\*19]** "personally approved (in writing) by the immediate supervisor of the individual making such determination." The parties have stipulated that the immediate supervisor of the revenue agent who made the initial determination to assert penalties against the Roots approved the determination of penalties under section 6662, in writing, before the Notice of Deficiency was issued. Accordingly, the Commissioner has satisfied the burden with respect to the supervisory approval requirement of section 6751(b)(1), and the Roots do not contend otherwise.

### A. *Absence of Substantial Authority*

The penalty for a substantial understatement of income tax under section 6662(b)(2) does not apply to any portion of the understatement attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment." I.R.C. § 6662(d)(2)(B)(i); *CF Headquarters Corp. v. Commissioner*, No. 22321-12, 164 T.C., slip op. at 19 (Mar. 4, 2025) (reviewed); Treas. Reg. § 1.6662-4(c)(3)(i). "In evaluating whether a taxpayer's position regarding the treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of the authorities supporting contrary positions." *CF Headquarters Corp.*, 164 T.C., slip op. at 19 (citing Treas. Reg. § 1.6662-4(d)(3)(i)). For purposes of determining whether substantial authority exists for a taxpayer's treatment of an item, authority includes the Code, the regulations, caselaw, and certain IRS administrative pronouncements. *Id.* (citing Treas. Reg. § 1.6662-4(d)(3)(iii)).

The Roots have not persuaded us that substantial authority supported their position. As our discussion above illustrates, the circumstances in the authorities the Roots cite are too dissimilar to their circumstances to provide substantial authority for their position. Accordingly, we conclude the Roots lacked substantial authority for their net operating loss claim.

### B. *Absence of Reasonable Cause*

No penalty is imposed under section 6662 with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]." I.R.C. § 6664(c)(1). The Roots have the burden to establish reasonable cause. *See United States v. Boyle*, 469 U.S. 241,

[*20] 245 (1985); *see also Cooper v. Commissioner*, 877 F.3d 1086, 1095 (9th Cir. 2017), *aff'g* 143 T.C. 194 (2014); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

"The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). Generally, "the most important factor is the extent of the taxpayer's effort to assess [his] proper tax liability." *Id.* Circumstances that may indicate reasonable cause and good faith include "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

The Roots argue that they had reasonable cause for the underpayment of tax for 2014 because they lacked experience in tax and relied on tax advisers in amending their 2014 return and in filing their returns for 2017 and 2018. To show that their reliance on tax advisers constitutes reasonable cause, the Roots must show that their reliance was reasonable. *Boyle*, 469 U.S. at 250–51; Treas. Reg. § 1.6664-4(b)(1) ("[A taxpayer's reliance on] professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.").

Our Court applies a three-prong test to determine whether a taxpayer reasonably relied on professional advice. Specifically, we analyze whether "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A.*, 115 T.C. at 99; *see also Cooper v. Commissioner*, 877 F.3d at 1095. Reasonable reliance on a professional "is a fact-specific determination with many variables, but the question 'turns on "the quality and objectivity of the professional advice obtained."'" *Am. Boat Co. v. United States*, 583 F.3d 471, 481 (7th Cir. 2009) (quoting *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 904 (E.D. Tex. 2007), *aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009)).

On the record before us, we are unable to determine that the Roots reasonably relied on tax advisers in preparing the return or pursuing the positions reflected in the return. The record does not demonstrate the qualifications of the advisers, the nature of the Roots'

**[\*21]** communications with them, or the quality or objectivity of the advice the Roots received. These facts are necessary to our analysis, and it was the Roots' burden to provide them. This they did not do. The Roots did not call the tax preparer from Rayburn & Rayburn LLP to testify at trial, and Mr. Root testified to not understanding the conversations between them.

### C. *Conclusion on Accuracy-Related Penalties*

In view of the foregoing, we sustain the determination of the accuracy-related penalties.[10]

## IV. *Conclusion*

As discussed above, we find that the Roots were not engaged in a trade or business with respect to the lodge by 2014 and had no net operating loss for that year. As a result, the Roots were not entitled to net operating loss carryovers into the 2017 and 2018 taxable years. Accordingly, we sustain the Commissioner's determination on this issue as well as on the accuracy-related penalties.

We have considered all of the parties' arguments and, to the extent not discussed above, conclude they are irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*

---

[10] In the alternative, the Commissioner determined accuracy-related penalties of 20% of the portion of the Roots' underpayments attributable to negligence or disregard of rules or regulations. *See* I.R.C. § 6662(b)(1). Because we have sustained the substantial understatement penalties, we need not address whether the Roots' underpayments were attributable to negligence or disregard of rules or regulations.